SCHOTT, Judge.
This is a suit for personal injuries and medical expenses resulting from an accident which occurred on March 3, 1972, when the automobile of plaintiffs was struck from the rear by an automobile being driven by the minor son of defendant Scandaliato and insured by Allstate. The trial judge awarded against Allstate alone general damages to Mr. and Mrs. Howard of $50,000 and $10,000 respectively, and to Mr. Howard $8,086.20 for medical expenses incurred by both plaintiffs. Defendant has appealed, contending that the awards are excessive, and plaintiffs have answered the appeal contending that the awards for general damages are inadequate. Liability is not in dispute.
As to Mrs. Howard, the trial judge found that she “suffered chronic muscle and ligament sprains in her neck, back, and arm over an extended period and was required to use a back support . . .” and that “an award of $10,000 to [her] is fair compensation for her past and future mental and physical pain and suffering.” The record does not reveal an abuse of discretion in this award.
Mrs. Howard was examined by her physician, Dr. Macalusoi on March 6, and he diagnosed cerebral concussion and cervical and lumbar sprains based upon subjective complaints and objective findings of muscle spasm. He prescribed medication and diathermy treatments. By the following month her neck was worse and she complained of pain in her right arm and hand, weakness in her right thigh and pain in her knee. A neck collar was prescribed which she wore for seven weeks. Medication and diathermy treatments were continued until June 5, 1972. On her next visit to Dr. Macaluso on January 22, 1973, he felt that she “was going as well as could be expected” and he discharged her. The following month she telephoned him and complained of more back and neck pain, whereupon he referred her to a neurosurgeon, Dr. Llewellyn.
Dr. Llewellyn examined her on February 19, 1973, and diagnosed muscle and ligament soreness at the base of the skull, neck tenderness and soreness of the mid and lower lumbar segments. Dr. Macaluso saw her again on March 8, 1974, when she was still complaining of pain in the neck, shoulder, elbows, knees and back. His examination revealed tenderness in the cervical and lumbosacral areas for which he prescribed medication and home heat application. He again saw Mrs. Howard in February, March and May, 1975, three weeks before trial, and on the basis of his examination his impression was a possible ruptured lumbar disc and/or lumbosacral instability syndrome and/or chronic cervical sprain instability. He believed her symptoms would continue for another year or two. In the meantime she was again examined by Dr. Llewellyn on February 28 and he found muscle spasm in the neck and low back which he believed were related to the 1972 accident. He recommended a myelo-gram since he was of the opinion that her injury was more serious than muscle and ligamental strains.
In her testimony, Mrs. Howard denied having any other accidents or traumatic events over this period of time and explained that her failure to seek continued *659 medical treatment was due to to the fact that she was preoccupied with her husband’s injuries. Her testimony was apparently accepted by the trial judge and Dr. Llewellyn’s objective finding of spasm over three years after the accident supports the award of the trial judge.
However, included in her husband’s award for special damages was an unrecoverable $30 for Dr. Macaluso’s report to her attorney and $316.69 for drug bills. Except the sum of $40, which is shown on the drug bills to have been prescribed by Dr. Macaluso, the balance was prescribed by one Dr. Touchy. The treatment given Mrs. Howard by Dr. Touchy was unrelated to the accident, so that to this extent the prescription bills are not recoverable and the judgment must be amended accordingly.
As to Mr. Howard, the trial judge said the following in his reasons for the award of $50,000:
“[He] struck his head aggravating a previous brain injury.
“He also suffered a cervical strain and was required to wear a neck collar and use a home traction device. As a result of the March 3, 1972 accident, Mr. Howard suffered aggravation of emotional depression which will require extensive therapy. Additionally, he developed ulcers which necessitated treatment. As a result of the above, Mr. Howard suffered a serious impairment of his intellectual capacity and is unemployable.”
Mr. Howard’s case is complicated by the fact that in August, 1971, he suffered injuries in a rearend collision, providing the basis for a previous lawsuit which went to trial in June, 1974, and after two days of trial was settled and compromised. Defendant concedes that the injuries resulting from the 1972 accident, when placed in the best possible light from Howard’s point of view, consisted of aggravation of his previous injuries for which he was already compensated by the settlement of the earlier case, but contends that such a mere aggravation cannot support the award of the trial court.
The injuries sustained by plaintiff in both accidents are in two general categories. The first includes cervical strains which plaintiff suffered in both accidents. At the time of the second accident, plaintiff apparently had recovered from the first cervical strain and apparently suffered an original cervical strain from the second accident as opposed to a mere aggravation of the first. This part of the case does not seem to be in great dispute but it is clear that this particular aspect of plaintiff’s injury from the second accident would not alone support much of the $50,000 award. The other category of injuries consists of organic brain damage with related emotional depression and ulcers, causation of which is the primary issue in the case.
Shortly after the first accident, plaintiff’s treating physician, Dr. Shushan, an internist, suspected that plaintiff had sustained a contusion of the brain. This suspicion was based primarily on plaintiff’s state of depression, demonstrated not only by conversation with plaintiff but also by a test which Dr. Shushan administered. Plaintiff also complained of headaches which in the doctor’s judgment were of a type consistent with brain damage as opposed to the type of headaches normally associated with a cervical strain. The physician’s suspicion of brain damage seemed to be confirmed by an abnormal electroencephalogram made on the plaintiff in September, 1971, and an abnormal brain scan made on the plaintiff in October. However, when plaintiff was referred by Dr. Shushan to the neurosurgeon, Dr. Llewellyn, for evaluation, this physician found no abnormal neurological findings and concluded that plaintiff’s only problem was a cervical strain. Plaintiff had complained to Dr. Llewellyn about the headaches, dizziness and a “feeling of vagueness in the head,” and he re-examined plaintiff in De *660 cember. The tests were again abnormal, but the doctor felt that plaintiff’s condition had improved since his first evaluation in October. Dr. Shushan continued to treat the plaintiff with medication for his depression, headaches and insomnia, and by February 22, 1972, his condition had improved but the doctor retained his impression that plaintiff had suffered organic brain damage in the first accident. Plaintiff had returned to work as a collector for an amusement machine company in November.[1]
On March 7, 1972, after the second accident, which is the subject of this suit, Dr. Shushan examined plaintiff and diagnosed primarily another cervical strain. He saw plaintiff on March 17, March 28 and April 11, 1972, and in this period he found primarily symptoms of the cervical injury. Depression was not particularly noted at this time. However, on April 17, 1972, Dr. Shushan found that plaintiff’s condition had changed drastically. Plaintiff complained of severe pain from headaches and the doctor was amazed to find that plaintiff had a great deal of brain damage with organic brain syndrome; he was just like a person who had become senile; was not oriented as to the date and month; he could not add or subtract simple things; and other evidence on testing showed him to be “a very, very sick man.” The doctor characterized these changes as sudden, “a marked acute change,” and he admitted plaintiff to the hospital for studies.
While in the hospital plaintiff was evaluated by a psychiatrist who had the impression that plaintiff suffered “an exacerbation of a chronic depressive neuroses with a lot of underlying raw, frustrated rage and increased dependency needs.” He found evidence that plaintiff was suffering from an organic brain syndrome, post traumatic, which should be substantiated by psychological testing. Plaintiff was also re-evaluated by Dr. Llewellyn who thought that plaintiff was showing neurological signs of injury for the first time with weakness on the right side of his face. He believed that plaintiff’s problems were markedly worse than they had been on his previous evaluation in December. Plaintiff was evaluated by a psychologist on April 26 and he reported a pattern of performance consistent with brain dysfunction and that plaintiff was a severely depressed individual. Shortly after his discharge from the hospital in April an additional EEG and another 'brain scan were made on plaintiff and revealed abnormalities. Over the next several months plaintiff remained under Dr. Shushan’s care and he was treated for his cervical strain and depression. His depression had lessened with the medication he was taking but he continued to suffer with headaches. He became more alert and his brain functions improved. However, in December he began to hemorrhage, he was hospitalized and was found to have developed an ulcer. He remained in the hospital for eleven days.
In January, 1973, plaintiff returned to his work and gradually thereafter depression and anxiety built up in the patient. Treatment with medication continued with some success although his mental state remained essentially the same, and in May he suffered a flareup of trouble from his ulcer. In August, 1973, plaintiff developed a tremor on the right side of his body. Dr. Shusan associated this with partial paralysis, and felt that this development confirmed his original suspicion that plaintiff had suffered damage to the left side of his brain. Dr. Shushan then referred plaintiff to Dr. Howell, a neurologist, and another psychologist for evaluation.
On the basis of his tests, Dr. Howell diagnosed probable cerebral concussion from the 1971 accident affecting the left side of plaintiff’s brain. He felt that the tremor *661 was related to the trauma. He saw plaintiff in November, April and July of 1974, and in January, March and May of 1975. An EEG in late 1973 showed an abnormality on the left side of plaintiff’s brain. Plaintiff complained to him of headaches, depression, an inability to count money in his job as a route collector or to add and subtract, and that as time went on his memory had worsened. Dr. Howell’s final diagnosis was contusion of the brain, which he would relate for the most part to the 1971 accident. He thought that the 1972 accident had caused a mild to moderate aggravation of his depression, but that the neurological findings were not related to the 1972 accident.
The psychologist, Dr. Galese, who examined plaintiff in September, 1973, compared his findings with those reported by the psychologist who had evaluated plaintiff in April, 1972, and he concluded that there was an increase in loss of function of the frontal lobe of the brain. He did not think plaintiff’s problems at that time could be exclusively related to the first accident, and on examination in February, 1975, he found that plaintiff’s condition had worsened. His tests indicated brain dysfunction and implied brain damage. He thought that the second accident certainly increased plaintiff’s emotional difficulties, personality problems, brain dysfunction and his reasoning capacity. He characterized the result of the second accident as a moderate to severe aggravation of decreased brain functioning.
Another psychiatrist evaluated plaintiff in January, 1975, and concluded that he had sustained “organic brain damage, minimal type” as opposed to “gross brain damage.”
By the end of 1973 Dr. Shushan found that plaintiff had become incapable of performing his job as a collector, and in January plaintiff reported that he was fired because of the many errors he was making. From that time until the date of the trial of this case in May, 1975, plaintiff continued to be treated by Dr. Shushan primarily with a variety of drugs for his mental and emotional problems. Dr. Shushan concluded that plaintiff was permanently injured with brain damage and was incapacitated from work without hope for rehabilitation. He estimated that all of plaintiff’s problems were caused, 50% by each of the accidents and the plaintiff would require future medical care at a cost of $4500.
The foregoing evidence is overwhelming to the effect that plaintiff endured severe mental and physical suffering as a result of both accidents. He is permanently disabled and an actuary estimated that his loss of earnings, based upon his life expectancy at age 53, would amount to approximately $100,000. In addition to the medical expense which Dr. Shushan projected he will undoubtedly incur expenses for drugs which, at the time of the trial, had already amounted to almost $1,000. The volume of drugs, such as tranquilizers, anti-depressants and pain relievers, all of various degrees of strength, taken by this plaintiff over the period of time between the first accident and the date of the trial is noteworthy. In any event, the problem of the case is not that a total award of $100,000 for such injuries from one accident would be excessive but defendant’s contention that the greater part of plaintiff’s suffering was the result of the first accident based on his own pleadings, testimony and medical witnesses.
At this point, some of defendant’s points should be noted. In plaintiff’s original petition in this case, filed in February, 1973, he claimed damages only to his neck and back. In August, 1974, he amended his petition and for the first time alleged that he suffered aggravation of a pre-existing brain injury. In the meantime, in June, 1974, he had begun the trial of his previous case arising out of the 1971 accident and made his settlement.
At the earlier trial Howard testified that the 1972 accident had resulted merely in *662 neck problems. At a deposition taken in April, 1973, Howard minimized the second accident to the effect that “it just stirred up [his] neck and [his] back, that was all.” When asked about the inconsistency between these statements and his testimony at the second trial he simply claimed that he could not remember the earlier testimony. When Dr. Galese examined Howard in 1973, Howard made no mention of the 1972 accident and indeed the doctor was not even aware of it.
The testimony of Drs. Shushan and Llewellyn at that previous trial was almost identical to the testimony of these physicians in the present case, except that the testimony in the present case continues beyond the date when the first trial was held. But at the first trial, it was quite remarkable that Dr. Shushan testified that plaintiff’s troubles were caused by the first accident, and in answer to the question of how the March 3, 1972, accident affected plaintiff’s physical condition, Dr. Shushan said:
“Temporarily flared up his neck symptoms and it flared up the picture, but it was in my opinion a mnior accident compared to the first one. We already had evidence that his brain had been damaged before the accident or the second accident had occurred.”
At the first trial Dr. Shushan did say that the second accident had some effect on plaintiff’s condition:
“I graded the second accident as a minor thing. It did flare up the problem. In evaluating proportionately the two I consistently felt that the first one was the major thing.”
Similarly, Dr. Llewellyn’s testimony at the first trial indicated that plaintiff’s troubles resulted from the first accident, but Dr. Llewellyn explained that his testimony at the first trial was based upon hypothetical that the second accident involved only a cervical strain whereas the opinions expressed at the second trial were now based upon hypotheticals and evidence that the second accident involved much more.
As to Dr. Shushan, he was vigorously cross-examined by able counsel for defendant on the point that he changed his testimony from that given at the first trial, but Dr. Shushan maintained that his testimony was not changed essentially since at the first trial he did testify that plaintiff’s mental condition was worsened as a result of both accidents, that both of them contributed to his emotional and mental problems as well as his ulcer, and specifically that in a report in January, 1973, to plaintiff’s attorney he expressed the opinion that plaintiff’s ulcer “was due to stress and this could be related to both accidents.”
In all fairness to defendant, it does appear that Dr. Shushan’s testimony in the first case was slanted to emphasize the first accident and de-emphasize the second accident, while the testimony at the second trial was slanted to emphasize the seriousness of the second accident as a cause of plaintiff’s problems.
All of these inconsistencies, along with others, brought out by defendant do serve to illustrate that plaintiff adopted two inconsistent patterns in the presentation of his two claims. They demonstrate an effort by plaintiff to show the first accident as the cause for practically all of plaintiff’s problems until the time when the first case was settled and then a change to show that the second accident was the cause, but we are not convinced that, as a matter of law, this compels a reversal or modification of the trial court’s award considering all the circumstances.
There was no adjudication after the first trial but a settlement was made. We cannot say that some percentage of the total damages attributable to the second accident was paid for in the first settlement any more than we can say that the first settlement was perhaps an over-payment, since it was ostensibly being made for *663 damages sustained only in the first accident. It is arguable that had the case been tried to a conclusion and judgment rendered after the first trial the court might have concluded that plaintiff sustained little of his damages from the first accident and the judgment would have so reflected. This is all speculative.
We know only that the trial judge in the instant case awarded plaintiff $50,000 for injuries finally suffered by plaintiff which are indeed serious and permanently disabling. If the trial judge thought these damages in total were worth $100,000 and therefore awarded plaintiff $50,000 by attributing half of the damages to the second accident, there is evidence in the record to support that decision. As a matter of fact it may be that the trial judge thought that plaintiffs total damages were worth well in excess of $100,000, but taking into consideration the equivocation found in Dr. Shushan’s testimony, he awarded plaintiff something less than 50% of the total damages as a result of the second accident. This, too, finds support in the record. We cannot conclude that the trial judge abused his discretion in making the award.
However, we do conclude that the trial judge was in error in awarding to plaintiff 100% of all medical and doctor bills incurred by plaintiff after the date of the second accident. Plaintiff is bound by the testimony of Dr. Shushan that he would attribute to the second accident not more than 50% of the cause of his problems. If it is so that plaintiff’s injuries would not have been as severe except for the second accident, defendant should be cast for only 50% of the bills incurred with the East Jefferson Hospital, Baptist Hospital, Dr. Galese, Browne-McHardy, Dr. Gelder, Dr. Llewellyn, Dr. Howell, Dr. Prickett and Dr. Shushan, as well as plaintiff’s drug bills.
Therefore, the total award for special medical expenses must be reduced by $3,487.91 in addition to the reduction of $276.69 from the drug bills incurred for Mrs. Howard and $30 from Dr. Macaluso’s bill.
Accordingly, the judgment appealed from is affirmed, but is amended to the extent that there is judgment in favor of plaintiff, Floyd Howard, against defendant, Allstate Insurance Company, in the sum of $54,291.60 plus interest and all costs.
AMENDED AND AFFIRMED.

. The personnel manager of plaintiff’s employer testified that plaintiff’s work was “fine” for the first three months but after the March, 1972, accident there was a big change in plaintiff’s health “which hampered him in his job.”